IN RE ESTATE OF EDWARD KRICHAU, DECEASED.
DELORIS KRICHAU, APPELLANT, V. JEFFREY H. JACOBSEN,
PERSONAL REPRESENTATIVE OF THE ESTATE OF EDWARD KRICHAU,
DECEASED, APPELLEE.

501 N.W.2d 722

Filed December 15, 1992.   No. A-90-1160.

John S. Mingus, of Mingus & Mingus, for appellant.

Terri S. Harder, of Jacobsen, Orr, Nelson, Wright, Harder & Lindstrom, P.C., for appellee.

HANNON, IRWIN, and WRIGHT, Judges.

HANNON, Judge.

Deloris Krichau filed a claim against the estate of her father-in-law, Edward Krichau, to collect for the expenses she incurred while he lived with her during the last 6 years of his life. The county court tried the claim and disallowed it. The claimant appealed to the district court and lost. She now appeals to this court.

Edward was 89 years of age when he died on April 16, 1987. The claimant had been married to James Krichau for nearly 45 years at the time of trial. Edward started living with Deloris and her husband in the latter part of 1981 and remained with them until he entered the hospital 10 days before his death.

Except for a witness who provided the foundation for a document which the court excluded from evidence as irrelevant, Deloris was the only witness. She testified that shortly after Edward came to live with her, he told her that she deserved some money for taking care of him. She testified that she and Edward arrived at the sum of $750 per month for as long as he remained in her home. When asked where this conversation took place, she responded, "I imagine, in my kitchen. That's where we did most of our talking." Deloris further testified: "As far as I know, I think just Ed and I [were

present]. I don't think Jim was there, but maybe he was. I can't recall if he was." She testified that the conversation took place in 1981 and then said, "Well, as near as I can remember, he said he thought I should have something for taking care of him." According to Deloris, Edward was the one who suggested the amount of $750 per month "[for] as long as he lived in our house."

Deloris cooked for the family, and Edward ate his meals with Deloris and her husband. She washed his clothes and cleaned his room. Apparently, laundry was not a big problem, as he only changed his clothes every 2 weeks, and according to Deloris, he never wanted to take a bath. She regularly took him to downtown Ravenna, Nebraska, to play cards, sometimes as often as two or three times per day. The claimant and her husband also took Edward to visit his sister whenever they went to visit her. He remained alert and able to take care of himself until the time he died.

Before he came to live with the claimant and her husband, Edward lived with his daughter, Sylvia Zimmer. He paid Sylvia $200 or $300 per month. The only money that he gave to Deloris was for the candy that she purchased for him. Edward received Social Security checks, but Deloris did not remember the amount of the checks although she regularly cashed them for him. (The conservator's accounting in the record shows that he received $299.90 each month from the Social Security Administration.) He did not have a bank account, and Deloris testified that she did not know where Edward spent his money. When she cashed his checks, he put the money in his billfold. He also received Agricultural Stabilization and Conservation Service payments, "PIK" certificates, and some payments on a land contract. The estate produced a check payable to Edward for $3,472 that was endorsed by the deceased and the claimant. She admits that she must have had something to do with cashing the check, but does not remember doing so. When presented with the check, she remembered getting $2,650 for Edward by cashing another check. Her husband also rented a farm from the deceased.

Deloris was unable to give what she would call an accurate estimate of the time she spent caring for Edward. When asked

when the $750 per month was to be paid, she responded, "Well, I imagine, whenever he decided to." When asked why she did not bill him, she said, "Well, I just figured that — ah — we'd just wait."

Edward died on April 16, 1987. James filed an application for informal probate of Edward's will on June 15. He was appointed personal representative and letters were issued to him on that date. The published notice advised creditors that they had to file their claims by August 12, 1987. The claimant filed her claim on June 22. The attorney who represented James as personal representative of Edward's estate prepared the claim. James did not allow or disallow that claim. On January 24, 1989, the other heirs of the estate filed a petition to remove him as personal representative on the grounds that he had failed to account for the assets of the estate and had failed to disallow the claim being litigated in this action. The parties stipulated that James would be removed as personal representative without prejudice to the rights of the parties to litigate on other issues. On May 3, 1989, the court removed James as personal representative on the basis of that stipulation and appointed Jeffrey H. Jacobsen to succeed him. Letters were issued to Jacobsen on July 18. On September 5, Jacobsen gave notice of disallowance of the claim being litigated in this action.

The claimant and her husband filed bankruptcy in December 1982. The claim against Edward was not listed as an asset in the bankruptcy proceedings.

In denying the claim, the county court recognized that Neb. Rev. Stat. § 30-2488 (Reissue 1989) provided that if the personal representative did not object to a claim within 60 days, that failure had the effect of allowing the claim. The statute further provided that after a personal representative allowed a claim, the personal representative could change his or her mind and disallow the claim. The court noted that § 30-2488 did not provide that the claim was irrevocably allowed if the personal representative did not object to the claim within 60 days and rejected the claimant's argument that the claim was allowed.

In denying the claim on the merits, the county court found that when personal services are rendered by a child to a parent, the services are presumed, in the absence of special

circumstances, to have been rendered gratuitously. The court stated that the presumption could be overcome by sufficient evidence establishing a contract by which the child would be paid. The court observed that the only evidence of a contract was the claimant's own testimony and that no collateral witnesses testified in support of the alleged contract. The court found that the claimant's evidence was insufficient to establish a contract.

## ASSIGNMENTS OF ERROR

The claimant lists six assignments of error, some of which contain subdivisions. Most of the assignments of error merely raise errors that the court allegedly made in findings of fact. The claimant's assignments may be distilled into two assignments of error: (1) The court erred in not finding that the claim was allowed because the personal representative did not object to it as provided in § 30-2488 and (2) the court erred in not allowing the claim on its merits.

## STANDARD OF REVIEW

In *In re Estate of Krueger*, 235 Neb. 518, 455 N.W.2d 809 (1990), the court held that an appeal from the allowance of a claim in probate will be heard as an appeal from an action at law. In reviewing an action at law, an appellate court reviews the evidence in the light most favorable to the prevailing party. *Id.* The judgment of the trial court in an action at law tried to the court without a jury has the effect of a jury verdict and will not be set aside unless clearly wrong. *In re Estate of Bouma*, 206 Neb. 209, 292 N.W.2d 37 (1980).

## FAILURE OF THE PERSONAL REPRESENTATIVE TO OBJECT TO THE CLAIM

The significant provisions of § 30-2488 are as follows:

As to claims presented in the manner described . . . the personal representative may mail a notice to any claimant stating that the claim has been disallowed. *If, after allowing or disallowing a claim, the personal representative changes his or her decision concerning the claim, he or she shall notify the claimant.* The personal representative may not change a disallowance of a claim

after the time for the claimant to file a petition for allowance or to commence a proceeding on the claim has run and the claim has been barred. . . . *Failure of the personal representative to mail notice to a claimant of action on his or her claim for sixty days after the time for original presentation of the claim has expired has the effect of a notice of allowance.*

(Emphasis supplied.)

The claimant alleges that the claim was allowed by the failure of the personal representative to object. The estate, on the other hand, alleges that the statute allows a personal representative to change his or her mind and disallow a claim if the personal representative has not sent notice of disallowance and as long as the claimant is not injured by the change. The estate further maintains that under Neb. Rev. Stat. § 30-2474 (Reissue 1989), the allowance of the claim was voidable in this case because the personal representative had a substantial conflict of interest. The county court accepted both of the estate's arguments.

The Nebraska Supreme Court has not determined whether a claim against an estate is irrevocably allowed if the personal representative does not give notice of disallowance within 60 days. In *Swett v. Estate of Wakem*, 490 A.2d 679 (Me. 1985), the probate court allowed claims without a hearing because the personal representative had not mailed a notice of either allowance or disallowance of their claims to the claimants. The claimants had filed petitions for allowance of their claims almost 1 year after filing their claims, and the personal representative filed replies denying that the deceased owed the claimants as alleged. After a hearing, the probate court allowed the claims without an evidentiary hearing, on the grounds that the personal representative had failed to mail notices of disallowance within the 60 days allowed by the Maine statute. Maine has adopted the Uniform Probate Code, and the applicable Maine statute (which is quoted in a footnote of the opinion) is substantively the same as § 30-2488(a).

The Supreme Judicial Court of Maine held that the last sentence of the Maine statute merely makes the claim presumably allowable if the personal representative does not take action within the 60 days allowed. The claimants in that

case, like the claimant in this case, argued that the personal representative's failure to give notice of disallowance automatically and conclusively allowed the claim. The Maine court based its holding on the fact that the statute read as follows: "[T]he personal representative may furnish a notice," and the failure to furnish notice "has the effect of a notice of allowance." The Maine court contrasted that statute with Maine's statute on claims against protected persons (which is comparable to Neb. Rev. Stat. § 30-2657 (Reissue 1989)). This latter statute provides that "[a] presented claim is allowed if it is not disallowed by written statement mailed by the conservator to the claimant within sixty days." The Maine court felt that if the legislature had intended the same result for estates of deceased persons as it did for estates of protected persons, it would have used the same words. (Section 30-2657 does not provide for the conservator to change his or her mind.)

Section 30-2488 also provides that "[i]f, after allowing or disallowing a claim, the personal representative changes his or her decision concerning the claim, he or she shall notify the claimant." This provision can have no purpose other than to allow the personal representative to change his or her mind. We note that the statute does not place a time limit on the personal representative's right to change his or her mind. The only limitation that the statute places on the personal representative's right to change a claim is the rule that a claim cannot be allowed after it has been barred. There is no reason why the personal representative can change his or her mind when the personal representative formally denied or allowed the claim, but not when the personal representative allowed the claim by inaction. The claimant of a newly disallowed claim would still have 60 days to file a petition for allowance in the court or commence a proceeding against the personal representative. § 30-2488(a). If the Legislature desired to prevent the personal representative from disallowing an allowed claim, it would have expressed its intention in the same manner as it did with respect to barred claims.

If the statute is interpreted to cause the personal representative to irrevocably allow the claim by not giving notice of disallowance within 60 days of its filing, personal

representatives will be forced to deny all claims except those claims that are unquestionably good. If the personal representative can change his or her mind and disallow a claim that was once allowed, the worst that could happen is that the claimant would be in a state of uncertainty. If certainty is an important element to a claimant, that claimant can always petition the court to allow the claim. In this regard, the claimant would be in no greater state of uncertainty than any other litigant doing business with a dilatory party and would suffer no greater disadvantage than a claimant who has received notice of allowance when the personal representative still has the power to disallow the claim.

We believe that § 30-2488 permits a personal representative to disallow a claim that has been allowed by the failure to object. We also believe that public policy is best served by this interpretation of the statute and not by a restrictive interpretation of the statute.

The claimant cites the case of *Estate of Hamilton v. Egan*, 633 P.2d 1100 (Colo. App. 1981). In that case, the personal representative failed to object to a claim that he did not know about and he distributed the assets and closed the estate. The personal representative attempted to reopen the estate and then belatedly gave notice of disallowance of the claim. The trial court held that the claim had been allowed by the personal representative's failure to disallow it. Colorado has adopted the Uniform Probate Code, and at that time, its statute was essentially the same as § 30-2488. (See Colo. Rev. Stat. Ann. § 15-12-806 (West 1974)). It is interesting to note that in 1979, Colorado amended its statute which had provided that the failure to give notice "has the effect of a notice of allowance" to provide that if the personal representative failed to mail notice of disallowance the claim was "deemed to be allowed." See § 15-12-806, Historical and Statutory Notes (West 1989). The Colorado court did not give a reason for its interpretation of the statute and, in addition, based its opinion on the additional fact that the statutes did not authorize the opening of the estate in that situation.

In this case, the personal representative who should have objected to the claim was the claimant's spouse. Normally,

claims for expenses incurred by a parent living in a household containing both a husband and a wife would be filed by both spouses. James may well be a necessary party to a determination of the claim. A personal representative has a conflict of interest when his or her spouse files a claim in the estate. Section 30-2474 provides: "Any sale or encumbrance to the personal representative, his spouse, agent or attorney . . . or any transaction which is affected by a substantial conflict of interest on the part of the personal representative, is voidable by any person interested in the estate."

James' action in not objecting to the claim is obviously a transaction affected by a substantial conflict of interest. Even if the notice of disallowance was considered late, filing is the only method available to void the allowance when the personal representative has a substantial conflict of interest.

## MERITS OF THE CLAIM

Our consideration of the merits of Deloris' claim is clearly controlled by the numerous cases on the subject. *In re Estate of Krueger*, 235 Neb. 518, 455 N.W.2d 809 (1990), is the most recent case, but the facts and holding of the court in *In re Estate of Bouma*, 206 Neb. 209, 292 N.W.2d 37 (1980), are closer to the case at hand. In *Bouma*, a father lived with his daughter for 6 years. Both she and her husband testified that the father said he would give her certain bonds if he lived with her. A brother of the appellant testified that the decedent said he was trying to get back some of what he "figured" the daughter owed him. The county court allowed the claim, but upon appeal to the district court, the claim was disallowed. Under the statutes that were in effect at the time, the parties were entitled to a jury trial in the district court on appeal. The parties elected to try the case to the court upon the record made in the county court. However, the district court's trial was treated as a trial of an action at law to a judge. The Supreme Court held that the record supported the district court's finding that the appellant had failed to sustain her burden of proof in that case.

Likewise, in this case, the effect of the decision of the county court is that of a jury verdict, which cannot be set aside unless clearly wrong. In a trial which determines the validity of a

claim, a county court judge is not required to accept the claimant's evidence even if it is not directly contradicted. In fact, the trial court judge did not accept the claimant's evidence in this case. The claimant was an interested witness, who testified rather unclearly regarding the facts necessary to establish a contract. She was also impeached by the following facts: (1) The deceased made no payments to the claimant even though he had the money and the claimant needed the money because she and her husband were going through bankruptcy at the time, (2) the claimant did not give any bills or statements to the deceased, and (3) the claimant did not mention the agreement to the deceased at any time after she claims it was made. In addition, the claimant did not list the claim as an asset in her bankruptcy. Her testimony was not corroborated by her husband even though he would be expected to have either overheard some conversation on the subject or visited with the deceased about the payments, if any payment was expected. The county court judge was not required to accept the claimant's testimony and apparently did not do so.

In his opinion, the county court judge noted that the only evidence of an existing contract was the claimant's own testimony. The county court judge then stated, "No collateral witnesses testified in support of the alleged contract and no history of payments can be demonstrated." The claimant argues that the county court judge held that the claimant must produce an independent witness to establish her claim. The opinion of the county court does not require the claimant to produce an independent witness in order to recover, nor did the county court judge say that the claimant would have recovered if she had produced such a witness. Obviously, the claimant would have recovered if she had produced an independent witness whose testimony was believed by the county court judge.

The judgment of the district court affirming the judgment of the county court and dismissing the action is affirmed.

AFFIRMED.