IN RE ESTATE OF ETTA I. JACKSON, DECEASED.
TONY RICH, PERSONAL REPRESENTATIVE OF THE ESTATE OF
ETTA I. JACKSON, DECEASED, APPELLEE, V.
VERA MILLER AND MAXINE ANCIRA, APPELLANTS.
583 N.W.2d 82

Filed July 28, 1998. No. A-97-1041.

Jon Worthman, of Jon Worthman Law Office, for appellants.

George A. Sommer for appellee.

MILLER-LERMAN, Chief Judge, and SIEVERS and MUES, Judges.

MUES, Judge.

## INTRODUCTION

Vera Miller and Maxine Ancira, sisters of the decedent, Etta I. Jackson, originally sought reversal of two separate orders of the county court acting as probate court. We have previously dismissed the appeal as to one such order, which allowed the claims of Tony Rich, Jackson's long-term live-in companion and the personal representative of Jackson's estate, for funeral and insurance expenses paid by Rich after Jackson's death. The appeal as to the other order, which allowed Rich $22,400 for his contributions to improvements, upkeep, and maintenance of Jackson's real estate and $14,400 for personal care services rendered to Jackson during the last 4 years of her lifetime, remains for our disposition. We affirm.

## BACKGROUND

Jackson passed away on December 31, 1996. On March 24, 1997, Rich was appointed personal representative of Jackson's estate pursuant to an application for informal appointment. Rich submitted two claims, one paid after Jackson's death for her funeral and burial expenses and for insurance expenses, and another for personal care services rendered to Jackson from December 1992 to December 1996 and for contributions for upkeep, maintenance, and improvements to Jackson's real estate from January 1, 1962, to December 31, 1996. Rich subsequently combined his claims into one petition for allowance of claim, to which Miller and Ancira filed two objections, one alleging that the funeral and insurance payments had been made with Jackson's money, and the other alleging that there was no agreement, express or implied, between Rich and Jackson that Rich would be paid for his services; that Rich and Jackson had a family relationship and that, thus, Rich's services were presumed to be gratuitous; and that during the 35 years Rich and Jackson lived together, neither had the intention that Rich would be compensated for any services he provided to Jackson.

Trial was held on July 11, 1997, on the claims arising after Jackson's death. Rich testified that he had known Jackson since

1961, when he was 29 and she was "36, 37. One of [sic] the other. I never liked to ask." Jackson was a widow at that time. Rich stopped attending school when he was in the sixth grade and testified that he had both a reading and a writing disability. According to Rich, Jackson purchased a home in Melbeta, Nebraska, in her own name, and in 1962 Rich and Jackson began living together, which they continued to do until Jackson's death in 1996. The record contains a deed dated October 17, 1961, conveying certain property in Scotts Bluff County to Jackson. Rich continues to reside in Jackson's home. Rich testified that he and Jackson never represented to anyone that they were husband and wife. According to Rich, during the time he and Jackson lived together, Jackson's income consisted of Veterans' Administration checks she received following her husband's death and, eventually, Social Security. She never worked outside the home during their relationship. For 16 years they lived in California, initially going there to care for seven of Rich's nieces and nephews. While they were in California, Rich supported Jackson and paid taxes and insurance on Jackson's Nebraska house, while Jackson's niece, Waunita Chapin, looked after the house. When Rich and Jackson returned to Nebraska, they lived in Jackson's house, where they remained until she died on December 31, 1996.

Rich testified that he and Jackson always kept their money separate, but that both of them contributed to the maintenance of the home and monthly expenses. Rich testified that he paid for Jackson's funeral from cash he had saved from his Veterans' Administration benefits, which he kept in a lockbox at home, and that after Jackson's death he also paid insurance premiums of $134 for Jackson's homeowners insurance and $84.15 for her auto insurance.

Chapin testified that she has known Jackson her entire life and that she has lived next door to Jackson's house in Melbeta since 1965. Chapin confirmed that the house was vacant while Jackson was in California and that Chapin and her husband took care of it. Chapin explained that she and Jackson had a close relationship and that she did the things for Jackson that a daughter would normally do for her mother, because Jackson did not have any children. Chapin testified as to a summary of

Jackson's Veterans' Administration benefits and monthly income over the years, compiling this information from documents kept in a lockbox at Jackson's home. Chapin also testified that Jackson had never worked outside the home while she lived with Rich and that Jackson was in very poor health, especially during the last 8 to 10 years of her life. These problems included having diabetes, being overweight, having vertebrae that had "fused themselves," and losing her eyesight. Chapin explained that for the 5 years before her death, Jackson had never dressed herself and that Rich "had to be there to take care of her and dress her." Chapin testified that 2 weeks before her death, Jackson came over and asked Chapin to help Rich "through the financial part," explained as "in paying the — the bills and taking care of the income and — and figuring out what bills needed to be paid, et cetera." Jackson also asked Chapin if she had any objections "if she were to put it all [the house and everything] in [Rich's] name." Chapin explained that several lockboxes containing Jackson's papers were opened in Chapin's home in the presence of Chapin's husband, Rich, and Ancira after Rich had first opened them in Jackson's home.

Chapin's husband testified that he opened or was present when five lockboxes were opened shortly after Jackson's death and that they contained personal papers, mementos, and money. The ownership of the individual boxes, as between Jackson and Rich, was not known to him. Chapin's husband testified that the lockboxes contained a total of over $9,000, $6,000 of which was in the box with "[Rich's] papers . . . in it," including an envelope containing approximately $4,000 with a designation on the front that the money was intended for funeral expenses.

Ancira testified that she was also present when the lockboxes were opened and that she recalled that "[t]hey had $4,000 or $5,000 they said they'd got from under her bed." Ancira explained that she had not been allowed in Jackson's home, but that she did not think this money had been kept in a box, but "between books and things." She thought that in one of the lockboxes there was an envelope marked " 'burial' " that had $4,000 in it. Ancira claimed that she knew the handwriting was Jackson's and that she was "sure" the money was also. Ancira characterized the relationship between Rich and Jackson as a

"dog and cat situation . . . [t]hey was always fighting and she'd tell him to get out but he wouldn't."

On rebuttal, Chapin and her husband both testified that no money was ever found under Jackson's bed and that all the lock-boxes, even Rich's, had been in a refrigerator in Jackson's bedroom.

On August 8, 1997, trial was held for the claims arising prior to Jackson's death. Dorothy Rhoades testified that she had known Jackson for about 8½ years and that Rich and Jackson usually visited her home twice a week during that time. She testified that during those visits, Rich took "very good care" of Jackson, helping her with the steps and into the car. Rhoades also testified that she never witnessed any disputes. Rhoades stated that Jackson had told her that Jackson could not even dress without Rich's help and that she especially depended on him to put on her shoes and socks. Jackson also told Rhoades that Rich cooked most of the meals. Rhoades testified that she had a conversation with Jackson several months before she died, in which Jackson told Rhoades that Jackson needed to get a will because when she died, Rich would be left alone, and he needed a place to stay. Jackson also told Rhoades that Jackson would have to go to a nursing home if it were not for Rich, because she could not drive, could not go out, and could not live alone.

Chapin testified again and agreed that, based upon her observations, Jackson would not have been able to stay in her home if Rich had not been there because he dispensed Jackson's medicine, cooked the meals, and bathed and dressed Jackson. Chapin restated her testimony about a conversation with Jackson about a week before Jackson's death in which Jackson asked Chapin to help Rich with the "paperwork" and to make sure he received the home so that he would have a place to live in for the rest of his life, because she felt that she at least owed him that much. Chapin stated that Rich had done all the upkeep and maintenance on the property since Jackson purchased it and that Rich also helped pay for the addition of a porch in 1982. Chapin also explained that while Rich and Jackson lived in California, Rich sent Chapin money to pay the taxes and insurance on the house in Nebraska. However, Chapin was not aware

of any contractual relationship between the two, and conceded that Rich paid no rent to Jackson to live in her home.

Leota Rogers, another of Jackson's sisters, confirmed Rich's care of Jackson and his contributions to the cooking, driving, and getting Jackson around, although she admitted that she had not seen them very much in recent years.

Rich testified that while he and Jackson lived together in her home, he added a front porch to the house and installed paneling throughout the house in 1981. He estimated the cost to be "close to $4,000, $5,000," but then conceded that he never really kept track of it. Rich testified that he was the "[w]hole support" for both of them while they were in California, where he was employed by a "tree surgeon outfit," and that when they returned to Nebraska, he found work as a handyman, doing yard work and cutting wood for a tree surgeon, and continued to be the "main support." Rich estimated, after much leading by his attorney, that he contributed about $50 per month toward the upkeep and maintenance of Jackson's home while he and Jackson lived there, for a period of 408 months. Rich testified that during the last 8 to 10 years of her life, Jackson was very sick, and that he did the shopping and cooking, and dressed and bathed Jackson. Rich explained that Jackson told him she wanted him to have the house because that was her way of paying him for taking care of her, because she did not have the money to pay him. Rich estimated the value of his services for the last 4 years of Jackson's life at $300 per month, for a total of $14,400, and stated that "if I didn't take care of her, she'd been in a rest home and that's expensive." He testified that he and Jackson did not consider themselves married, but that they did consider themselves partners.

The value of Jackson's estate, as reflected on a short-form inventory in the record, is shown as $9,399.62; $7,000 for the house, $700 for a vacant lot, and the balance made up of miscellaneous personal property and a 1983 Chevrolet automobile.

The county court first allowed Rich's $4,825.73 claim for postdeath expenses and subsequently, by separate order, allowed Rich's claim for contributions to the improvements, upkeep, and maintenance of Jackson's real estate in the amount

of $22,400, and for personal services in the amount of $14,400. Miller and Ancira filed a single notice of appeal, contesting both orders. As stated, Rich's motion to dismiss the appeal of the first order as untimely was granted by this court. We now decide the remaining portion of this appeal, that being the order allowing the claim for personal care services rendered to Jackson and for contributions made to Jackson's real estate.

## ASSIGNMENT OF ERROR

Miller and Ancira's assignment of error, as it relates to the claim arising from predeath services and contributions to Jackson's real estate, is simply that the county court erred by finding for Rich and allowing his claim. However, Miller and Ancira's brief addresses only the personal care services claim, and as such, we will not consider the assignment of error as it pertains to Rich's claim for contributions to the real estate. See *State v. Merrill*, 252 Neb. 736, 566 N.W.2d 742 (1997) (assignments of error not argued in brief will not be considered on appeal).

## STANDARD OF REVIEW

In *In re Estate of Krueger*, 235 Neb. 518, 455 N.W.2d 809 (1990), the Nebraska Supreme Court held that an appeal from the allowance of a claim in probate will be heard as an appeal from an action at law. In reviewing an action at law, an appellate court views the evidence in the light most favorable to the prevailing party. *Id.* The judgment of the trial court in an action at law tried to the court without a jury has the effect of a jury verdict and will not be set aside unless clearly wrong. *In re Estate of Krichau*, 1 Neb. App. 398, 501 N.W.2d 722 (1992).

An appellate court reviews probate cases for error appearing on the record made in the county court. *In re Estate of Potthoff*, 6 Neb. App. 418, 573 N.W.2d 793 (1998). When reviewing an order for errors appearing on the record, the inquiry is whether the decision conforms to the law, is supported by competent evidence, and is neither arbitrary, capricious, nor unreasonable. *In re Estate of Kopecky*, 6 Neb. App. 500, 574 N.W.2d 549 (1998).

## DISCUSSION

*Gratuitous Services by Family Members.*

A claim for services rendered to a decedent may be allowed against his or her estate where the services have not been paid for and they were rendered under, and in conformity with, an agreement or contract that they would be paid for, whether the contract was express or implied, and, if implied, whether implied in fact or implied or created by law. 34 C.J.S. *Executors and Administrators* § 370 (1942). An express contract is not essential to allowance or recovery, since, in the absence of such express contract, the estate is liable where the services were rendered at the request of, or were voluntarily accepted by, the decedent with the expectation on the part of both the claimant and the decedent that proper and reasonable compensation would be paid. *Id.* Compensation cannot be allowed for services which were performed gratuitously. *Id.* Where a claimant and a decedent lived together in one household and as members of one family, it is presumed that services rendered to each by the other were rendered gratuitously, and a promise to pay therefor will not be implied by law from the mere rendition of such services. *Id.* at § 371.

When there is a family relationship between a decedent and a claimant seeking compensation for services rendered to the decedent, the claimant must rebut by competent evidence the presumption that the services were rendered gratuitously. *In re Estate of Krueger, supra.* See, also, *Tracy v. Tracy, ante* p. 143, 581 N.W.2d 96 (1998). The presumption diminishes in direct proportion to the remoteness of the degree and nature of the family relationship and the character of the duties performed. *In re Estate of Krueger, supra.* The burden of proof is upon the claimant seeking compensation for services rendered during the life of the decedent to prove an agreement, express or implied, to pay for the services. *Id.*

*Relationship of Parties.*

Our analysis of this case must begin with the recognition that Rich and Jackson were not married. The evidence is uncontroverted that Rich and Jackson were never married, that they never held themselves out to be married, and that they main-

tained separate finances throughout their many years together. However, Miller and Ancira argue that the relationship between Rich and Jackson was a quasi-family relationship and that it should be treated for purposes of the foregoing rules as a husband-wife relationship. Accordingly, Miller and Ancira contend that there is a presumption here that the services rendered by Rich were rendered gratuitously. We agree.

We believe that under the circumstances of this case, Rich and Jackson were in a family relationship for purposes of the presumption that services rendered by one family member to another family member are rendered gratuitously, even though they were not married. They lived together and maintained a joint household for over 30 years. Rich and Jackson went shopping together, visited relatives together, and ate their meals together. Rich referred to Chapin as his niece, even though she was actually Jackson's niece. Although Nebraska has never directly addressed whether a degree of legal kinship is necessary to invoke the "presumption of gratuitous services" rule, other jurisdictions have. See, e.g., *Wells v. Goff*, 361 Mo. 1188, 239 S.W.2d 301 (1951) (where claim was resisted on ground that "family relation" existed, fact that parties lived together for 20 years even though they were not married was sufficient to show family relationship); *In re Thompson's Estate*, 297 Mich. 479, 298 N.W. 103 (1941) (rule that gratuitous services are presumed between family members applies when family relationship actually existed, although there was neither consanguinity, affinity, nor adoption).

Although the trial court did not expressly find that a family relationship existed between Rich and Jackson for purposes of the rule now being discussed, the evidence is capable of no other reasonable construction but that such a relationship existed for the purposes of that rule. Thus, the determinative issue is whether the trial court's implicit finding that Rich overcame the presumption of gratuitous services was clearly wrong.

*Overcoming Presumption.*

The presumption that services rendered are gratuitous can be overcome by competent evidence. See, e.g., *In re Estate of Krueger*, 235 Neb. 518, 455 N.W.2d 809 (1990).

Statements made by a decedent during his or her lifetime that he or she would give a claimant an interest in the decedent's property for services rendered by the claimant, while not independently enforceable, are admissible to rebut any presumption that the services were rendered gratuitously and permit recovery for the reasonable value of the services. See *In re Estate of Baker*, 144 Neb. 797, 14 N.W.2d 585 (1944). The general rule is that if payment for services was to be made by a conveyance or devise of property by a decedent, but he or she refused or neglected to perform such in his or her lifetime and the amount to be paid was not agreed upon, then the person rendering the services is entitled to recover the reasonable value thereof. *Id.*

Rich testified that Jackson told him while he was taking care of her that she would like him to have the house as a way of paying him, because she did not have the money to pay him. Chapin testified that approximately 1 week before Jackson died, Jackson asked her to make sure that Rich received the house so that he would have a place to live in for the rest of his life, because she at least owed him that much. Rhoades, a friend of Rich and Jackson's, testified that in a conversation approximately 3 months before Jackson died, Jackson told her that "I'm gonna have to get a paper and get this filed to [sic] because if something happens to me, then [Rich is] gonna be left alone. He has nowhere to go and he's got to have a place to stay." This comment was made after Rhoades told Jackson that Rhoades had filed her will that day. Following the comment, Jackson asked Rhoades who her attorney was and how much the will had cost her.

When we view the competent evidence most favorably to Rich, it is clear that he presented sufficient evidence to overcome the presumption that he rendered services to Jackson gratuitously. It is equally clear by the comments that Jackson made to people during her lifetime that Jackson intended that Rich be repaid in some fashion for his many and varied services to her, including cooking, cleaning, and shopping, as well as medicating, bathing, dressing, and chauffeuring her. Rich estimated the reasonable value of his services to be $300 a month for the last 48 months of Jackson's life. That rate is not challenged on appeal. We are not permitted to decide this case anew. The trial

court's finding which allowed the claim in that amount was not clearly wrong. See *In re Estate of Krichau*, 1 Neb. App. 398, 501 N.W.2d 722 (1992). The decision of the county court conforms to the law, is supported by competent evidence, and is neither arbitrary, capricious, nor unreasonable. See *In re Estate of Kopecky*, 6 Neb. App. 500, 574 N.W.2d 549 (1998).

## CONCLUSION

Rich and Jackson lived together as a family unit for over 30 years. A family relationship existed. Any services rendered by Rich to Jackson are presumed in law to be gratuitous. However, in the instant case, we cannot say that the trial court's implicit finding that Rich presented sufficient evidence to overcome this presumption was clearly wrong. As such, the trial court's order awarding him $14,400 for personal services rendered to Jackson must be affirmed. Because any error in allowing Rich's claims for contribution to the real estate was not argued, we do not consider it in this appeal.

AFFIRMED.